[No. F009010. Fifth Dist. Mar. 6, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN ARTHUR HALLOCK, Defendant and Appellant.

COUNSEL

Philip R. Clarkson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Roger E. Venturi and Janet Neeley Kvarme, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BEST, J.—Following trial by jury defendant was convicted of first degree burglary (count I; Pen. Code,[1] § 459), assault with intent to commit rape (count II; § 220), attempted rape (count III; §§ 664, 261, subd. (2)), and intimidating a witness (count IV; § 136.1, subd. (c)(1)). The jury found defendant not guilty of attempted rape (count III; §§ 664, 261, subd. (2)) and petty theft (count V; § 484).

A probation revocation hearing was held simultaneously with the jury trial on the above charges.

Defendant was sentenced to a total of nine years and eight months, as follows: count I (burglary), the upper term of six years; count II (assault with intent to commit rape), the upper term of six years stayed pursuant to section 654; and count IV (intimidation of a witness), a consecutive upper

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

term of four years, with one year stayed. In addition, defendant was sentenced to a three-year consecutive term on the probation violation, with all but eight months stayed.

We reverse defendant's conviction for intimidating a witness (count IV; § 136.1, subd. (c)(1)) and affirm the judgment in all other respects.

### STATEMENT OF FACTS

On January 7, 1987, Louise G., age 77, was watching the news in her living room at about 7 p.m. when she heard a racket in the bedroom and went to investigate. There she discovered defendant, who had apparently climbed through the window. Mrs. G. recognized defendant, who was the son of her cleaning lady, and whom she had known since he was 10 or 12 years old. Defendant grabbed Mrs. G. and told her he was going to rape her. Mrs. G. replied, "Oh, no, Brian, you're not a gonna rape me," and defendant replied, "Yes, I am."

Mrs. G. tried to dissuade defendant from his announced intention by telling him to go home and talking to him for about 10 minutes in her living room. Each time Mrs. G. picked up the phone to call defendant's mother, defendant jerked the phone from her hand. Defendant smelled strongly of alcohol, but his words were not slurred.

Defendant repeatedly told Mrs. G. he intended to rape her and eventually pushed her into the bedroom onto the floor and got on top of her. He then told her that her husband (who had died in 1979) had said she was a "hussy" and that he wanted defendant to rape her. As defendant struggled to pull up Mrs. G.'s nightgown and unzip his pants, Mrs. G. managed to escape by spitting juice from the tobacco she was chewing into defendant's eyes and pushing him off.

After her escape, Mrs. G. ran outside into her front yard. Defendant followed her, pushed her down and climbed on her again. However, Mrs. G. was again able to get free. As she fled to her neighbor's house, defendant threatened, "if you tell anybody anything that happened tonight here . . . I'll blow your house up."

As she escaped, Mrs. G. last saw defendant sitting in the doorway of her living room. She had left her purse on the living room floor, and when she returned later with a police officer, she discovered that $25 was missing from her purse.

Mrs. G. was a frail woman who suffered from arthritis and heart trouble and occasionally used a cane. During the scuffle with defendant she injured

her knee, turned her ankle and badly bruised her hand. Her neighbor, Mrs. Arambula, testified Mrs. G. was hysterical when she arrived at her house and was unable to speak coherently for about five minutes.

The Kern County Sheriff's office was called and officers discovered that someone had entered Mrs. G.'s back bedroom window, leaving scuff marks on the wall and mud on the bedspread. The living room was in disarray with the telephone found on the floor.

That same evening some officers went to defendant's mother's house and found defendant asleep. Defendant's wet and muddy clothes were seized. Defendant was identified at the scene by Mrs. G. A swab from defendant's eye area was taken that night and analysis showed that amylase, a chemical present in bodily fluids such as saliva, was present.

*Defense*

Defendant testified that he had gone to the victim's house the night of his arrest to do a "security check" to show her how easily a burglar could enter her house. He knew she kept a back window open and entered through the window. Defendant knew Mrs. G. had been burglarized in the past. He also testified he had had a few beers, and that alcohol tends to bring on his epileptic seizures.

When Mrs. G. saw him in the house she became hysterical and started beating him on the chest. He pushed her back gently and followed her into the living room, where he went blank. He claimed to remember nothing during that time period. He denied telling the victim he intended to rape her or that her husband had told him she was a hussy and to rape her.

Defendant's mother testified that defendant's appearance when he returned home that night was consistent with his appearance after an epileptic seizure. His clothing was wet and he was incoherent and glassy-eyed. She further testified that defendant cannot support himself on his hands and knees during a seizure and that he also cannot talk or run. She also stated defendant cannot unbuckle or unzip his pants during a seizure because his body and hands would be jerking too much—his whole body stiffens and shakes during a seizure.

## DISCUSSION

## I

*Was it prejudicial error to give an instruction on the assumption of a defendant's "sound mind" when the defenses of intoxication and unconsciousness due to epilepsy were raised?*

■ Defendant contends that the court erred by instructing the jury to assume that he was of sound mind at the time of the offense; he argues that this instruction created a conclusive presumption on the material issue of specific intent, a constitutional violation of his right to due process. (Citing *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450].) He further contends the error was prejudicial. Plaintiff, while conceding it was error to give CALJIC No. 3.34 since it was withdrawn in 1981, contends the error was harmless under *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101, 3106.]

The trial court gave CALJIC No. 3.34 as follows: "The intent with which an act is done is shown as follows:

"[By a statement of his intent made by a defendant.]

"By the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act.

"[For the purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constituted the crime described in the information.]" This instruction was given even though the most recent use note indicates it was withdrawn in 1981, and despite the fact an earlier use note specifically warns against giving the last paragraph in a specific intent crime if there is evidence of diminished capacity.[2] This cautionary note was provided because

---

[2] After giving CALJIC No. 3.34, the court also instructed as follows: "In the crimes of which the defendant is accused, in counts, one, two, three, four and five of the Information, a necessary element is the existence in the mind of the defendant of a specific intent. If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if the defendant had such specific intent.

"If, from all the evidence, you have a reasonable doubt whether a defendant formed such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent.

". . . . . . . . . . . . . . . . . . ."

instructing the jury to assume the defendant is of sound mind and then also instructing the jury to consider his mental state and intoxication in determining if he had the specific intent to commit the crime "could have the potential of leaving the jury in a state of confusion." (*People* v. *Wingo* (1973) 34 Cal.App.3d 974, 979 [110 Cal.Rptr. 448].)

This case is very similar to *Wingo, supra,* 34 Cal.App.3d 974, where the jury was instructed pursuant to CALJIC No. 3.34 and was also instructed as follows: " 'In the crime of attempted burglary of which the defendant is accused, a necessary element is the existence in the mind of the defendant of the specific intent to commit burglary which includes the intent to commit a theft. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent. [¶] If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent.' " (*People* v. *Wingo, supra,* 34 Cal.App.3d at p. 978.)

The *Wingo* court held that even though the trial court had erroneously instructed the jury it must assume the defendant was of sound mind, taken as a whole, the instructions adequately instructed the jury on diminished capacity and the giving of CALJIC No. 3.34 did not constitute prejudicial error. In affirming the conviction, the court concluded: "In the instant case the jurors could obtain a correct concept of the law applicable to specific intent and of the effect of voluntary intoxication on such intent from all the instructions given on the subject. Under the instructions that were given to the jurors they would understand that if the evidence showed defendant was intoxicated, such intoxication could negate specific intent to commit the crime charged. A reading of the two instructions under scrutiny discloses a meaning to the effect that the jurors were to assume that defendant was of sound mind at the time of his alleged conduct unless they concluded from the evidence that he was then intoxicated, and that if they found he was intoxicated they were to determine whether such intoxication prevented defendant from entertaining the specific intent to commit the crime charged. Accordingly, we cannot say that the giving of the 'sound mind' instruction as a prelude to the 'intoxication' instruction could have caused

"A person who commits an act while unconscious is not guilty of a crime. This rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from an attack of epilepsy or any similar cause. Unconsciousness does not require that a person be incapable of movement. Evidence has been received which may tend to show that the defendant was unconscious at the time and place of the commission of the alleged offense for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was conscious at the time of the—at the time the crime was committed, he must be found not guilty."

the jurors to become confused to the extent that we would now be required to say that, as a matter of law, it constituted prejudicial error." (*People* v. *Wingo, supra,* 34 Cal.App.3d at p. 979; accord *People* v. *Lewis* (1977) 74 Cal.App.3d 633, 643 [141 Cal.Rptr. 614].)

Subsequent developments in the area of constitutional law and presumptions that could lessen the plaintiff's burden of proof or which shift the burden of persuasion to the defendant indicate that an evaluation of prejudice requires a closer and more vigorous scrutiny than was done in *Wingo.* (See *Sandstrom* v. *Montana, supra,* 442 U.S. 510, 523-524 [61 L.Ed.2d 39, 50-51]; *Francis* v. *Franklin* (1985) 471 U.S. 307 [85 L.Ed.2d 344, 105 S.Ct. 1965]; *People* v. *Roder* (1983) 33 Cal.3d 491, 504 [189 Cal.Rptr. 501, 658 P.2d 1302].)

Plaintiff also contends this case is similar to, and controlled by, the recent California Supreme Court case of *People* v. *Babbitt* (1988) 45 Cal.3d 660 [248 Cal.Rptr. 69, 755 P.2d 253].

In *Babbitt, supra,* 45 Cal.3d 660, the defendant relied on unconsciousness due to psychomotor epilepsy, and the jury was instructed on this defense. The jury was also instructed, however, as follows: " 'If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he were conscious, you should find that he was conscious, unless from all the evidence you have a reasonable doubt that he was in fact conscious at the time of the alleged offense. [¶] If the evidence raises a reasonable doubt that he was in fact conscious, you must find that he was then unconscious.' " (*People* v. *Babbitt, supra,* 45 Cal.3d at p. 690, fn. 9.)

Both parties in *Babbitt* relied on *Patterson* v. *New York* (1977) 432 U.S. 197 [53 L.Ed.2d 281, 97 S.Ct. 2319] in support of their contentions. In disposing of defendant's contention that the subject instruction lightened or shifted the burden of persuasion, as contended in this case, the court discussed *Patterson,* noting that it involved a second degree murder charge in New York, where emotional distress is a defense to the charge, but the burden is on the defendant to prove the defense by a preponderance of the evidence.

"Rejecting the contention that this scheme impermissibly shifts the burden of persuasion from the prosecutor to defendant in violation of due process, the high court noted that the affirmative defense of extreme emotional disturbance 'does not serve to negative any facts of the crime which the State is to prove in order to convict of murder. It constitutes a separate

issue on which the defendant is required to carry the burden of persuasion; . . .'" (*People* v. *Babbitt, supra,* 45 Cal.3d at p. 692.)

Defendant's attempt to distinguish his case from *Patterson* on the basis that the unconsciousness defense negates an element of the crime was rejected in *Babbitt* as follows: "The United States Supreme Court's concern in *Patterson* that the defense of extreme emotional disturbance did not negative any facts of the crime that the state was required to prove related not to whether absence of the defense was an element (which the state would then be required to prove), but rather, to the nature of the defendant's burden of proof. The rule is that 'when there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People, the accused need only raise a reasonable doubt as to the existence or nonexistence of the fact in issue.' [Citation.] When, however, the defense raises 'factual issues collateral to the question of the accused's guilt or innocence [which] do not bear directly on any link in the chain of proof of any element of the crime' [citation], there is no constitutional impediment to requiring the accused to prove the collateral facts by a preponderance of the evidence [citation]. [Citation.]

"In *Patterson,* because the emotional-distress defense raised factual issues collateral to the question of guilt and did not serve to negative any element of the crime charged, the state could constitutionally require the defendant to carry the burden of persuasion by a preponderance of the evidence. [Citations.] In the instant case, by contrast, defendant's burden was only to raise a reasonable doubt that he was conscious, and then only if the prosecution's proof did not of itself raise such a doubt. [Citations.] Hence, it is immaterial for present purposes that the unconsciousness defense served to negative an element of the crime." (*People* v. *Babbitt, supra,* 45 Cal.3d at pp. 694-695, fn. omitted.)

In this case, in order to convict defendant of burglary and assault with intent to commit rape, the prosecution had the burden of proving beyond a reasonable doubt that defendant harbored the specific intent to commit rape when he entered the residence. As in *Babbitt,* defendant's burden in this case was simply to raise a reasonable doubt that he was conscious or of his ability to form a specific intent to rape, because unconsciousness and intoxication are defenses (§§ 26, 28), and not elements of the crimes charged. In other words, once defendant raised these defenses, plaintiff assumed the burden of disproving them. However, this fact alone does not transform absence of these defenses, i.e., consciousness and/or sobriety, into elements of the crime for purposes of due process analysis. (*People* v. *Babbitt, supra,* 45 Cal.3d at p. 693.)

While *Babbitt* dealt with rebuttable presumptions, defendant contends that CALJIC No. 3.34 states a conclusive presumption rather than a rebuttable one. If this instruction were isolated defendant's contention would be correct. However, *Wingo, supra,* teaches that we cannot simply focus on the offending instruction without considering it in relation to the others. This concept was recently stated in *Francis* v. *Franklin, supra,* 471 U.S. 307, 315 [85 L.Ed.2d 344, 354], as follows: "Analysis must focus initially on the specific language challenged, but the inquiry does not end there. If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption. [Citation.] This analysis 'requires careful attention to the words actually spoken to the jury . . . , for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction.' [Citation.]"

As in *Babbitt,* the jury here was instructed on the presumption of innocence, the prosecution's burden to prove every element of the crimes charged beyond a reasonable doubt, and the sufficiency of circumstantial evidence to prove intent or mental state. On the issue of intoxication the jury was also instructed that if the evidence showed the defendant was intoxicated at the time of the offense, the jury should consider his state of intoxication in determining if he had the requisite specific intent. If there was a reasonable doubt whether defendant formed such specific intent, the jury was told, "you must give the defendant the benefit of that doubt and find that he did not have such specific intent."

On the issue of consciousness the jury was told that evidence had been presented tending to show defendant was unconscious at the time of the offense, and that if, after a consideration of all the evidence, it had a reasonable doubt the defendant was conscious at the time of the crime, he must be found not guilty.

The instructions on the affirmative defenses, when read in conjunction with CALJIC No. 3.34, rendered the error in giving CALJIC No. 3.34 harmless since the instructions as a whole told the jury that plaintiff had the burden of proving beyond a reasonable doubt that defendant was conscious and not intoxicated to the point where he could not form the required specific intent.

Moreover, even assuming the instructional error does encompass due process concerns, we find it to be harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Rose* v. *Clark, supra,* 478 U.S. 570.) Here, the only evidence of intoxication was defendant's testimony that he had had 12 beers that night, and the victim's statement that he smelled of alcohol. To the contrary, defendant also testified he was thinking straight the night of the crime, the victim said defendant's words were not slurred and defendant's mother testified that he did not appear drunk when he returned home that night.

There was even less evidence of unconsciousness. The victim testified that defendant grabbed her, said he was going to rape her, conversed with her for 10 minutes, jerked the phone from her hand each time she tried to call his mother and finally pushed her into a bedroom and attempted to rape her, telling her she was a hussy. When she managed to free herself, defendant pursued her outside and again knocked her down and got on top of her. When she finally escaped, defendant threatened her if she reported the crime. In short, these actions were entirely inconsistent with the defense that defendant was actually suffering an epileptic seizure. His mother testified that during such a seizure defendant cannot even support himself on his hands and knees, nor can he get up and run or talk. Furthermore, the victim testified she had cared for epileptics during seizures, had seen them many times and that defendant did not have a seizure that night.

In addition to the court's repeated instructions regarding the specific intent required to convict, the closing arguments also informed the jury that it had a duty to acquit defendant if it had a reasonable doubt that he was conscious at the time of the crime. Finally, in light of the defendant's repeated statements that he intended to rape the victim, evidence of intent was strong. The instructional error was therefore harmless beyond a reasonable doubt.[3]

## II

*Was there sufficient evidence that defendant violated section 136.1, subdivision (c)(1), and, if so, were the various alleged instructional errors prejudicial?*

In count IV of the information the charge was as follows: "[Defendant] did willfully, knowingly, maliciously, and unlawfully prevent and dissuade

---

[3]The foregoing analysis applies with equal or greater force to defendant's conviction for intimidating a witness. Defendant's defense was that he simply did not make the statement attributed to him by the victim.

Louise [G.], a victim and witness of a crime, by means of force and threats of unlawful injury to person and damage to the property of herself and another, from making a report of such victimization to a peace officer, state and local law enforcement officer, probation, parole, and correctional officer, prosecuting agency, and judge; and arresting and causing and seeking the arrest of a person in connection with such victimization, in violation of Section 136.1(c)(1) of the Penal Code, a felony."

The court, however, instructed the jury with regard to count IV as follows: "Defendant is charged in count four of the Information with a commission of the crime of intimidating a witness, a violation of Section 136.1(c)(1) of the Penal Code.

"A person who knowingly and maliciously prevents or dissuades or attempts to so prevent or so dissuade, where such act is accompanied by force or by an express or implied threat of force or violence upon any witness or victim, or any third person, to so prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding or inquiry authorized by law is guilty of the crime of intimidating a witness . . . ."

■ Defendant raises four issues based on the foregoing instruction: (1) There is insufficient evidence for his conviction on count IV because there was no evidence of attempt to dissuade a victim from attending or testifying at any trial; (2) there is insufficient evidence that he made a threat of force or violence against a victim or third person; (3) giving the wrong instruction was prejudicial error; and (4) the court prejudicially erred by failing to define, sua sponte, the words "knowingly and maliciously."

Plaintiff contends that (1) there was sufficient evidence to convict defendant under section 136.1, subdivision (a) *or* (b); (2) what is involved is instructional error; (3) giving the wrong version of the instruction on witness intimidation was harmless error; and (4) if the error is reversible, retrial is not barred by double jeopardy considerations.

Section 136.1 basically prohibits four forms of witness intimidation. In subdivision (a), it forbids knowingly and maliciously preventing or dissuading a witness or victim from attending or testifying at trial. Subdivision (b) prohibits preventing or dissuading a witness or victim from (1) reporting the victimization; (2) causing a complaint or similar charge to be sought; and (3) arresting or causing or seeking the arrest of any person in connection with such victimization. All of these crimes are made a felony where the act is accompanied by force or an express or implied threat of violence upon a witness, victim, or the property of any witness, victim, or third person. (§ 136.1, subd. (c)(1).)

As noted above, defendant was charged pursuant to subdivision (b) but the jury was instructed on a violation of subdivision (a). Plaintiff contends there was no error since the threat which constituted witness intimidation was sufficiently broad so that the jury could have found a crime was committed under either subdivision (a) or (b). (Citing *People v. Thomas* (1978) 83 Cal.App.3d 511, 514 [148 Cal.Rptr. 52], and *People v. Ford* (1983) 145 Cal.App.3d 985 [193 Cal.Rptr. 684].) *Thomas* and *Ford,* however, are distinguishable on the basis that in those cases a criminal proceeding was under way at the time of the threats. In the somewhat analogous case of *People v. Weidert* (1985) 39 Cal.3d 836, 852-854 [218 Cal.Rptr. 57, 705 P.2d 380], the case was past the arrest stage when the killing of a witness was committed.

In the instant case, the threat was made at the time of the original crime and was as follows: "if you tell anybody anything that happened tonight here, . . . I'll blow your house up." We reject plaintiff's contention that the threat herein was sufficiently broad to encompass a violation of subdivision (a) as well as subdivision (b). Defendant's threat could only reasonably have been believed to have been directed at reporting the crime to the police, defendant's mother or others in authority that might lead to defendant's arrest. It is also unreasonable to conclude that defendant was concerned with testimony at a future trial for a crime for which he had not yet been arrested.

Plaintiff also contends any error was instructional and does not go to the issue of sufficiency of the evidence. Plaintiff is only partially correct, as is defendant in his contention that he cannot be retried on this offense.

To the extent we hold defendant's above quoted threat did not bring him within the provisions of section 136.1, subdivision (a), it is clear that plaintiff, upon reversal of defendant's conviction under subdivision (b), cannot try defendant for a violation of subdivision (a) on plaintiff's theory that the threat was broad enough to encompass a violation of subdivision (a). (*People v. Young* (1987) 190 Cal.App.3d 248, 259 [235 Cal.Rptr. 361].) On the other hand, it appears there was sufficient evidence to convict defendant of a subdivision (b) violation; however, the jury was improperly instructed. If reversal is predicated on instructional error, the parties agree that double jeopardy principles do not come into play. (*Forman v. United States* (1960) 361 U.S. 416, 426 [4 L.Ed.2d 412, 419-420, 80 S.Ct. 481]; *Burks v. United States* (1977) 437 U.S. 1, 15 [57 L.Ed.2d 1, 12, 98 S.Ct. 2141].)

In the recent case of *People v. Young, supra,* 190 Cal.App.3d 248, we faced a similar problem. There, the defendant was charged and convicted of rape "accomplished against a person's will by means of force, violence or

*fear of immediate and unlawful bodily injury on the person of another.*"
(§ 261, subd. (2), italics added.) Defendant challenged the sufficiency of the
evidence for failure of proof of force, violence or fear of immediate and
unlawful bodily injury. Like this case, *Young* also involved instructional
deficiency. The jury, while properly instructed on the theory of force, was
incompletely instructed with regard to the theory that the rape was alterna-
tively committed by means of fear of immediate and unlawful bodily injury.
(*People v. Young, supra,* at pp. 259-260, fn. 4.) Similar to our situation here
with regard to witness intimidation under subdivision (a), we concluded
that there was insufficient evidence to support the conviction for rape on the
theory that it was committed by means of fear of immediate and unlawful
bodily injury. Therefore, the conviction could not be upheld on that basis,
and further retrial on that theory would violate the double jeopardy clause.
(*Id.* at p. 259.) Also like this case with regard to witness intimidation under
subdivision (b), there was sufficient evidence of force to support the rape
conviction. The underlying problem in *Young* was that it was more proba-
ble than not, given the incomplete instruction telling the jury it could
convict on the basis of fear alone—omitting any reference to the require-
ment that it be fear of immediate and unlawful bodily injury—that the jury
convicted defendant based on the unsupportable fear theory because there
was minimal evidence, albeit substantial for purposes of appellate review, of
force. In short, we could not say, given the erroneous instruction, that the
defendant was convicted on the proper and supportable theory of rape by
force instead of the unsupportable theory of rape by means of fear of
immediate and unlawful bodily injury. Relying on *People v. Green* (1980) 27
Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468], and *People v. Houts* (1978) 86
Cal.App.3d 1012, 1019 [150 Cal.Rptr. 589], we deemed reversal was
required.

Our holding in *Young* has been justly criticized for its lack of clarity in
the case of *People v. Knox* (1988) 204 Cal.App.3d 197, 202 [251 Cal.Rptr.
121]. The *Knox* court, however, incorrectly characterizes our holding in
*Young.* We did not hold that a rape cannot be sustained if there is evidence
of force but no evidence of fear of immediate and unlawful bodily injury.
We stated unequivocally that "By the use of the disjunctive word 'or,' it is
clear the Legislature intended two distinct ways in which a violation of
section 261, subdivision (2), can occur, i.e., by 'force' or 'fear.' " (*People v.
Young, supra,* 190 Cal.App.3d at p. 259.)

Confusion may lie, however, in the fact that we did not make clear that
the instructional error was the sole basis for reversal of Young's conviction,
and not the simple fact that there was insufficient evidence to support the
fear theory. While we stated at the outset of our discussion of the sufficiency
of the evidence that "we must . . . determine whether, *if properly instruct-*

*ed,* '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'" (*People* v. *Young, supra,* 190 Cal.App.3d at p. 254, first italics added), we never fully explained the significance of the improper instruction to our sufficiency-of-the-evidence discussion. Our statement in footnote 4 that "the conviction on count III would have to be reversed in any event because of erroneous instructions as to the crime of rape" (*id.* at p. 259) may also be confusing since the only basis for reversal was the instructional error. The statement in footnote 4 was merely intended to point out that even if we were to conclude that there was substantial evidence to support the fear theory of rape, the evidence was so weak that the instructional error could not be held harmless. Thus, while it was clear that reversal of the rape conviction would be required, our extended discussion with regard to the sufficiency of the evidence was for the purpose of determining whether retrial would be permitted. However, in discussing the sufficiency of the evidence it also became clear that, given the inadequate instructions on the theory of fear and the state of the evidence (weak evidence on the issue of force and insufficient evidence on the question of fear), reversal was also required on the basis that we could not state defendant was not convicted on an unsupportable theory. (*Ibid.*) Regrettably, our opinion did not make this clear. The discussion here is intended to avoid any confusion in future cases.

■  Returning to the instant case, on the question of whether giving the wrong instruction was prejudicial, it is noted that this case is distinguishable from *Young* in that here there was absolutely no instruction regarding the specific witness intimidation offense actually charged and upon which defendant was convicted. Therefore, we need not speculate on the probability of whether defendant was convicted on an unsupportable theory. It is clear that he was.

While conceding the instructional error, plaintiff contends it was harmless because, if properly instructed, the jury would have convicted defendant. "In other words, in this particular case, the jury must have found [defendant's] threat was directed at keeping the victim quiet, whether it be in court or in talking to police to report [defendant] or to have him arrested. Thus, even if the jury had been properly instructed in the language of [subdivisions] (b)(1) and (3), it must have found [defendant] guilty of witness intimidation." In making this contention plaintiff overlooks the other instructional errors which compounded the problem. As plaintiff concedes, aside from being given the wrong instruction on witness intimidation, that instruction itself was also incomplete because it failed to include threat against property as a basis for conviction. As already discussed in issue I, the jury was erroneously instructed on soundness of mind, which instruction also had application to count IV. Finally, the court failed to give an

instruction which defined "knowingly and maliciously." (See CALJIC Nos. 1.21 and 1.22.)

Plaintiff notes that when an instruction given by the court is correct as far as it goes, and the only valid objection to it is that defendant desires more complete or explicit instructions, he must request them, otherwise no error occurs. This rule cannot apply here, however, since the instruction given by the court was *not* correct. Moreover, it appears the definitions of knowingly and maliciously were essential in this case since these are elements of the required mental state of the crime charged. Given the various instructional errors already discussed, it cannot be said that the failure to give CALJIC Nos. 1.21 and 1.22 was harmless.

In summary, the various instructional errors, in combination if not singly, were prejudicial with regard to count IV. There was sufficient evidence presented at trial to convict defendant of the charged offense and, therefore, retrial on that charge will not violate double jeopardy principles. Plaintiff's contention that defendant's alleged threat also violated section 136.1, subdivision (a), is incorrect since the evidence presented does not support such a violation. Therefore, defendant may not be retried for witness intimidation under that subdivision.

### DISPOSITION

The judgment of conviction and sentence with regard to count IV only, a violation of section 136.1, subdivision (c)(1), as charged in the information, is reversed. In all other respects, the judgment is affirmed.

Martin, Acting P. J., and Ardaiz, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 7, 1989.