Filed 3/1/24  P. v. Lacerda CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAUL LACERDA,<br><br>    Defendant and Appellant. | H049690, H049749<br>(Santa Clara County<br>Super. Ct. Nos. C2013908, C2005357,<br>C2104499, C2105945) |

Defendant Paul Lacerda was convicted by a jury of various offenses in case No. C2013908 (unspecified statutory references are to the Penal Code):  assault with a deadly weapon (§ 245, subd. (a)(1); counts 1 and 5); making a criminal threat (§ 422, subd. (a); count 2); felony vandalism (§ 594, subd. (b)(1); counts 3 and 6); misdemeanor vandalism (§ 594, subd. (b)(2)(A); count 4); vehicle theft (Veh. Code, § 10851, subd. (a); count 7); attempted robbery (§§ 212.5, subd. (c), 664; count 8); reckless driving (Veh. Code, § 2800.2, subd. (a); count 9); two counts of hit-and-run (Veh. Code, § 20002, subd. (a); counts 12, 15); petty theft (§ 488; count 17); battery on a person with whom defendant had a dating relationship (§ 243, subd. (e)(1); count 18); infliction of corporal injury on a person with whom defendant had a dating relationship (§ 273.5, subd. (a); count 20); and seven counts of contempt of court (§ 166, subd. (c)(1); counts 10, 11, 13, 14, 16, 19 and 21).  The charges in case No. C2013908 all stemmed from defendant's conduct toward a woman who was the subject of a protective order against him. Defendant also resolved three trailing felony cases by negotiated disposition and was sentenced to a term of five years eight months in prison.

On appeal, defendant challenges certain convictions in case No. C2013908. He contends his convictions on counts 1, 2, 4, 7, 8, 10, 12, 13, 16, 17, 18, and 19 must be reversed due to the erroneous admission of testimonial hearsay evidence under the doctrine of forfeiture by wrongdoing. He contends his conviction on count 5 for assault with a deadly weapon must be reversed due to instructional error, and his conviction on count 2 for making a criminal threat must be reversed due to insufficient evidence. He also raises various objections to his sentence. We will reverse the conviction for assault with a deadly weapon due to prejudice from the instructional error. We will uphold defendant's remaining convictions, and remand for possible retrial on the reversed count as well as resentencing.

## I.   BACKGROUND

The charges in case No. C2013908 arose from seven separate incidents between August 2020 and February 2021. We briefly summarize the trial testimony regarding only two of the incidents, as the facts of the other five events are not directly relevant to the issues raised on appeal (although we note that they included acts of domestic violence).

### A. THE AUGUST INCIDENT

According to evidence introduced at trial, defendant and his former girlfriend R.G. were arguing at a hotel. They left the hotel and had a conversation in the parking lot. Defendant asked R.G. to " 'take a drive up the mountain' " with him, but she refused, as the last time they had driven up the mountain together, defendant drove so fast that she thought he was trying to kill them both. She instead told defendant to leave her alone. As she began to drive away from the hotel, defendant told her, " 'watch, I'm gonna make sure I run you off the road and kill you.' " She initially thought "nothing of it" because defendant had "said it before" but "never did anything like that." But defendant proceeded to follow her and drive his car into hers multiple times. She called 911 and

2

told the dispatcher that defendant was "going crazy." The 911 transcript indicates she was crying as she explained that defendant had hit her car and she believed he had a gun.

A bystander also called 911 to report seeing R.G.'s sedan leave the hotel parking lot, followed by defendant's large SUV which rammed into the rear of the sedan at a speed of roughly 30 to 35 miles per hour, then again at roughly 20 to 25 miles per hour. The SUV continued to follow the sedan down the street, and the witness also followed the two cars but "lost view of them for a few minutes" until she saw the sedan parked in a church parking lot. The SUV left the parking lot as the witness pulled in. The witness parked and spoke to R.G., who seemed very upset and out of breath from crying. The rear of the sedan "was just totally smashed in." When the witness asked R.G. whether she knew the driver of the SUV, R.G. replied that "it was her ex-boyfriend, and that he was trying to kill her."

Another witness was washing his car in the church parking lot when he saw the sedan pull in. The SUV passed the church, reversed, and turned into the parking lot. As the sedan attempted to leave the lot, the SUV collided with it from behind at a speed of roughly 25 miles per hour. The SUV reversed, collided with the sedan again, and continued moving forward with its tires screeching. It pushed the sedan forward a distance of roughly 10 feet, "almost going on top of the" sedan at one point. The SUV then left the parking lot and drove away at a high speed.

As a result of the incident, defendant was charged with assault with a deadly weapon (§ 245, subd. (a)(1); count 1), making a criminal threat (§ 422, subd. (a); count 2), and contempt of court (§ 166, subd. (c)(1); count 10).

## B. THE DECEMBER 2020 INCIDENT

R.G. called 911 while driving and told the dispatcher that defendant was following her. She said defendant was "getting really close to" her car and "trying to hit" it. She told the dispatcher she was afraid defendant was about to "whack" her car or throw something at her window. Shortly after that, she said defendant was "hitting" her car and

3

explained that he had "banged" it from behind with his car. She also told the dispatcher that defendant had a large flashlight and she was "scared he will throw it at the window." Defendant threw the flashlight at the car, shattering the windshield.

A police officer responded to R.G.'s 911 call and spoke to her. She told him she went to visit defendant and they got into an argument. Defendant told her to return the rental car she was driving, and he followed her to make sure she returned it. When defendant realized she was not going to return the car, he "got next to" her car and yelled at her to turn around. She turned around but again did not stop to return the car, at which point defendant "banged the car. … [¶] … from the back." In her words, defendant "barely" hit her car and "didn't do it that hard." She kept driving, and defendant collided with her car again from the side. Defendant pulled ahead of her, stopped, and got out of his car. She stopped as well, and defendant approached her car with the flashlight that he later threw at the windshield. The responding officer noticed "a smashed window on the front windshield" of R.G.'s car, as well as damage to "the front left or driver's side corner panel and bumper" and "a small scratch on the rear bumper of the vehicle."

As a result of the incident, defendant was charged with assault with a deadly weapon (§ 245, subd. (a)(1); count 5), felony vandalism (§ 594, subd. (b)(1); count 6), contempt of court (§ 166, subd. (c)(1); count 14), and hit-and-run (Veh. Code, § 20002, subd. (a); count 15).

## C. RECORDED JAIL CALLS

Between March and August of 2021, while defendant was incarcerated, he made numerous phone calls to R.G. and other women. In his conversations with R.G., he repeatedly asked her not to cooperate with the prosecution. Defendant's statements included: "You're not gonna show up for court, right baby?"; "Please don't show up for court, please, love?"; "You're not gonna show up for court, right?"; "Don't show up for court, either, please"; "don't come to court, okay?"; and "You get subpoenaed, you just get, you just plead the Fifth." He also told R.G. not to "fall off on" him. In April 2021,

4

defendant told another woman that he did not trust R.G. and did not want to talk to her but had to "fuckin' stick to this bitch because of everything that's going on in this court, this, this shit, you know." Defendant told the woman he wanted to marry her. Three days later, he asked R.G. to marry him. On two occasions in May 2021, defendant told another woman that he gave R.G. a car to keep her from showing up to court.

The prosecution moved for a ruling that R.G.'s statements to police and 911 dispatchers were admissible under the doctrine of forfeiture by wrongdoing, as codified in Evidence Code section 1390. The trial court granted the motion, basing its decision on statements from the jail calls. In August 2021, the prosecution called R.G. as a witness at defendant's trial. She informed the court that she would be exercising her Fifth Amendment privilege against self-incrimination, at which point she was granted immunity. The court explained to her that because she was granted immunity, she had to answer questions and could be held in contempt of court if she refused to do so. She nonetheless refused to answer the prosecutor's questions. The court found her in contempt of court, ruled she was unavailable under Evidence Code section 240, and admitted her out-of-court statements into evidence.

### D. CONVICTIONS AND SENTENCE

The jury found defendant guilty of all charges in case No. C2013908. Following his trial, defendant pleaded no contest in case No. C2005357 to two counts of second degree burglary (§ 460, subd. (b)), two counts of grand theft (§ 487, subd. (a)), and one count of receiving stolen property (§ 496, subd. (a)). In case No. C2104499, he pleaded no contest to possessing a firearm as a convicted felon (§ 29800, subd. (a)(1)) and resisting a peace officer (§ 148, subd. (a)(1)). He also pleaded no contest to reckless driving (Veh. Code, § 2800.2, subd. (a)) in case No. 2105945.

The trial court sentenced defendant to five years eight months in prison. Defendant's sentence in case No. C2013908 included the upper term of four years for assault with a deadly weapon (count 1), a concurrent upper term of four years for vehicle

5

theft (count 7), and concurrent upper terms of three years for making a criminal threat, felony vandalism, attempted robbery, and reckless driving (counts 2, 6, 8, 9). The court sentenced defendant to concurrent middle terms in the trailing felony cases.

## II. DISCUSSION

### A. ADMISSIBILITY OF THE VICTIM'S TESTIMONIAL STATEMENTS

Defendant contends his Sixth Amendment right to confront witnesses against him was violated by the admission of R.G.'s out-of-court statements under the doctrine of forfeiture by wrongdoing. Under the Sixth Amendment's confrontation clause, testimonial hearsay generally cannot be introduced at trial unless the defendant has had an opportunity to cross-examine the declarant. (*Crawford v. Washington* (2004) 541 U.S. 36, 68.) The doctrine of forfeiture by wrongdoing "extinguishes confrontation claims on essentially equitable grounds" and has been accepted by the United States Supreme Court as an exception to the general rule. (*Id.* at p. 62.) That doctrine, as set forth in Evidence Code section 1390, allows for the admission of hearsay evidence "against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." (Evid. Code, § 1390, subd. (a).)

The trial court found R.G.'s statements admissible based on the "many jail calls" between defendant and R.G., as well as "calls by defendant to other individuals when he indicated his true feelings about the victim" and explained that actions and statements "such as offering to marry her and giving her a car were done and said just to get her to not appear in court." Defendant does not appear to contest the trial court's factual findings regarding intent and causation, but argues he did not engage in conduct sufficient to constitute "wrongdoing" as a matter of law. The Attorney General contends defendant's statements on the jail calls rose to the level of "wrongdoing" and, alternatively, any error was harmless as to certain counts because certain out-of-court

6

statements were also admitted as nontestimonial spontaneous statements under Evidence Code section 1240.  Finding no error, we need not reach the issue of prejudice.

Both parties cite *People v. Reneaux* (2020) 50 Cal.App.5th 852 (*Reneaux*), a case in which the defendant's statements to the victim in two jail calls made four months apart were found sufficient to constitute wrongdoing.  (*Id.* at p. 878.)  Although Reneaux's statements "were not explicitly threatening or directive" (*Id.* at p. 868), the *Reneaux* court reasoned that "in the context of domestic violence offenses and abusive relationships, which typically include an element of inherent psychological coercion," verbal conduct may rise to the level of wrongdoing even if not explicitly threatening.  (*Ibid.*)  We agree with that principle and find it applicable to defendant's conduct.  The record suggests that defendant regularly contacted R.G. over a period of months and misled her about the nature of his feelings toward her, for the purpose of keeping her entangled in their relationship so that she would refuse to testify against him.  He repeatedly asked her not to come to court, instructed her to "plead the Fifth" instead of testifying, thanked her when she described hanging up on a prosecutor calling about the case, and told her she was doing a "good job" by not cooperating with the prosecution.  On this record, we find he engaged in wrongdoing.

Defendant's actions here go beyond those of the defendant in *Reneaux*, who contacted the victim on only two occasions (*Reneaux*, *supra*, 50 Cal.App.5th at pp. 859–860), and fall within the range of conduct that has been deemed wrongdoing in other cases.  (See *Steele v. Taylor* (6th Cir. 1982) 684 F.2d 1193, 1201, fn. 10.)  "Wrongful conduct obviously includes the use of force and threats, but it has also been held to include persuasion and control by a defendant, the wrongful nondisclosure of information, and a defendant's direction to a witness to exercise the fifth amendment privilege." (*Id.* at p. 1201.)  Although we acknowledge that Evidence Code section 1390 requires a finding of wrongdoing in addition to findings of intent and causation, that threshold is met on this record by defendant's persistent and manipulative

7

communications to and about R.G. We express no opinion as to whether a different set of facts might lead to a different conclusion.

## B. INHERENTLY DEADLY WEAPON INSTRUCTION

Defendant was charged with two counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 1, 5). With respect to those counts, the trial court instructed the jury on the definition of a "deadly weapon" as follows: "A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." The parties correctly agree that the court's instruction was erroneous under the circumstances, as held by the California Supreme Court in *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*), because the weapon defendant was accused of using (a car) is not inherently deadly as a matter of law and constitutes a deadly weapon only if used as such. Defendant contends the error was prejudicial as to count 5, without challenging his conviction on count 1, while the Attorney General argues the error was harmless because the jury could not have found defendant guilty without finding that he used the car in such a way as to make it a deadly weapon.

"Only a few items that are designed to be used as deadly weapons are inherently deadly." (*Aledamat*, *supra*, 8 Cal.5th at p. 8.) In cases involving other weapons, the instruction given here is legally erroneous and requires reversal unless harmless beyond a reasonable doubt. (*Id.* at pp. 7–9.) The jury in *Aledamat* received an additional instruction, which applied to a special allegation rather than the charge of assault with a deadly weapon: " 'In deciding whether an object is a deadly weapon, consider all of the surrounding circumstances including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose.' " (*Id.* at pp. 4–5.) On the basis of that additional instruction, the Supreme Court found it unlikely that the jury would have found the weapon in question (a box cutter) "inherently deadly" for purposes of the assault charge "without

8

considering the circumstances, including how defendant used it." (*Id.* at p. 14.) Here, the jury was instructed: "In deciding whether an object is a deadly weapon, consider all the surrounding circumstances." But the jury was not specifically instructed to consider the manner in which the object was used, and we are thus less confident than the Supreme Court in *Aledamat* that the jury necessarily did so.

Given the erroneous instruction and the facts of the December incident, the jury could have found defendant guilty on count 5 based on the mistaken belief that his car could be considered "inherently deadly" without finding that it was a deadly weapon as used. There was relatively minor damage to R.G.'s car beyond that caused by the flashlight, which was not alleged to be a deadly weapon, and she told police that defendant "barely" hit her car and "didn't do it that hard." Under those facts, we cannot conclude beyond a reasonable doubt that the error did not contribute to the verdict, because a properly instructed juror could entertain a doubt about whether defendant used his car in a manner likely to cause death or great bodily injury. The jury was instructed that an object can be "inherently deadly" even if not used in such a manner, and the jury was not provided with the legal definition of "inherently deadly" weapon. As a result, jurors could have relied on the known dangers associated with driving to determine that defendant's car was "inherently deadly." Coupled with the factual uncertainty regarding whether defendant used the car as a deadly weapon, we do not find the instructional error harmless beyond a reasonable doubt.

## C. SUFFICIENCY OF THE EVIDENCE OF A CRIMINAL THREAT

Defendant argues there was insufficient evidence to support his conviction for making a criminal threat (§ 422, subd. (a); count 2). "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).) We presume the

9

"existence of every fact that the trier of fact could reasonably deduce from the evidence" to support the judgment.  (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  To overturn a conviction, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it."  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

The crime of making a criminal threat has five elements, one of which is "that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety[.]' "  (*People v. Toledo* (2001) 26 Cal.4th 221, 228, citing *Bolin*, *supra*, 18 Cal.4th at pp. 337–340, fn. 13.)  Defendant asserts that the element of sustained fear was not proven in his case because his threat to " 'run [R.G.] off the road and kill [her]' " did not actually cause her to fear for her own safety, as evidenced by her statement to police that she thought "nothing of it" at first. But defendant cites no authority supporting his position that the fear must be felt immediately, and ample evidence supports the inference that events shortly following defendant's issuance of the threat caused R.G. to fear that defendant intended to act on his statement to her.

R.G. told police that, on one earlier occasion, defendant had driven so fast with her in the car that she thought he was trying to kill them both.  On the day of the charged crime, defendant and R.G. argued at a hotel.  As she left in her car, he told her, " 'watch, I'm gonna make sure I run you off the road and kill you.' "  He then immediately followed her and drove his car into hers multiple times, causing serious damage to her car and leading bystanders to fear for her safety.  R.G. called 911 to report that defendant was "going crazy" and hitting her car.  The transcript states that she was crying, as did a witness who spoke with her at the scene of the incident.  The witness said R.G. seemed extremely upset and told her that the other driver "was her ex-boyfriend, and that he was trying to kill her."  A jury could reasonably conclude from the evidence that, even if initially unalarmed by defendant's threat, R.G. almost immediately came to fear that

10

defendant would act on it. While it is possible for a victim's fear to be so attenuated from the alleged threat as to render it legally insufficient, that is not the case here.

## D. SENTENCING ISSUES

The parties correctly agree that defendant's sentences on counts 10, 11, 13, 14, 16, 19, and 21 should be stayed under section 654; the one-year sentences on the misdemeanor counts 12, 15, and 17 were unauthorized as exceeding the six-month maximum; and defendant's parole period should be reduced from three years to two years consistent with a legislative change that applies retroactively. We accept the Attorney General's concessions on those points, and the trial court will be required to resentence defendant accordingly on remand.

Defendant raises a fourth challenge to his sentence, which the Attorney General contests. When the trial court sentenced defendant in December 2021, Senate Bill No. 567 (2021–2022 Reg. Sess.; eff. Jan. 1, 2022) was not yet in effect but it applies retroactively to his case. Senate Bill No. 567 amended section 1170, subdivision (b) to allow an aggravated prison term to be imposed only if the aggravating factors supporting it are admitted by the defendant or found true by a jury. (Stats. 2021, ch. 731, § 1.3.) Here, the parties identify two aggravating factors that were cited by the trial court as grounds for defendant's upper term sentence but were not admitted by defendant or found true by the jury: that the "crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 4.421(a)(1)) and that "defendant was armed with or used a weapon at the time of the commission of the crime" (*id.*, rule 4.421(a)(2)). The parties agree that one of those factors, defendant's use of a weapon, should not have been used to impose an upper term for assault with a deadly weapon on count 1 because use of a weapon is an element of that offense. (See *id.*, rule 4.420(h).) Defendant urges us to remand the matter for resentencing, while the Attorney General argues that remand is unnecessary because the sentencing errors were harmless.

11

As we have explained, we will reverse defendant's conviction on count 5 due to instructional error, and the prosecution may retry that count on remand. (See *People v. Hallock* (1989) 208 Cal.App.3d 595, 607.) Even if the prosecution elects not to do so, resentencing is appropriate. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.) We will therefore remand the matter for possible retrial and resentencing, without considering whether the trial court's reliance on improper factors in sentencing defendant to an upper term was prejudicial. On remand, the trial court will be required to resentence defendant in accordance with all applicable law, including section 1170 as amended by Senate Bill No. 567.

### III. DISPOSITION

The judgments are reversed, and the matter is remanded to the trial court with instructions to vacate defendant's conviction on count 5 in case No. C2013908. Defendant may be retried on that count. Following retrial, or the prosecution's election not to proceed with retrial, the trial court shall resentence defendant in a manner consistent with this opinion.

_____
Grover, Acting P. J.

**WE CONCUR:**

_____
Lie, J.

_____
Bromberg, J.

H049690, H049749
*People v. Lacerda*